**Date signed April 15, 2005**



*James F. Schneider*

**JAMES F. SCHNEIDER**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | * | |
| DOCTORS HEALTH, INC., | * | Case No.  98-6-6211-JS |
| Debtor in Possession | * | Chapter 11 |
| *    *    *    *    *    * | * | |
| DOCTORS HEALTH, INC., | * | |
| Plaintiff | * | |
| v. | * | Adv. Pro. No. 99-5563-JS |
| NYLCARE HEALTH PLANS OF THE MID-ATLANTIC, INC., | * | |
| | * | |
| Defendant | | |

*    *    *    *    *    *    *    *    *    *    *    *    *

### MEMORANDUM OPINION DISALLOWING CLAIM OF NYLCARE HEALTH PLANS FOR THE MID-ATLANTIC, INC., IN ITS ENTIRETY AND GRANTING JUDGMENT IN FAVOR OF DOCTORS HEALTH, INC., AGAINST THE SAID DEFENDANT IN THE AMOUNT OF $21,300,000

Doctors Health, Inc. ("Doctors Health"), a health care provider and debtor in

possession, filed the instant adversary proceeding against NYLCare Health Plans of the

Mid-Atlantic, Inc. ("NYLCare"), a health maintenance organization ("HMO")[1] for

damages for breach of contract and the disallowance/equitable subordination of the

defendant's proof of claim in the amount of $19,607,967, which has since been

increased by amendment to $29,796,049.37.[2]

---

[1]As defined by Maryland statute, an HMO is

. . . an organization that agrees to provide certain hospital and medical services for its members in return for predetermined capitation payments made on a periodic basis by or on behalf of the members.  An HMO may carry out its obligation to provide the hospital and medical services in three ways: (1) with respect to physician services, it may provide the services directly, through employees or partners of the HMO; (2) it may contract with hospitals and physicians or physician groups to provide the services; or (3) . . . it may contract with an Administrative Service Provider (ASP) for the ASP to provide, either directly or through "external providers," the services for which, as between the HMO and its members, the HMO is responsible.

*Dimensions Health Corp. v. Maryland Ins. Admin.,* 374 Md. 1, 4, 821 A.2d 40, 42 (2003). Maryland Health-General Code, § 19-701(g).

[2]The amended claim is Claim No. 1165, filed by NYLCare Health Plans of the Mid-Atlantic on March 30, 2000, which states as follows:

NYLCare Health Plans of the Mid-Atlantic, Inc., is a federally qualified health maintenance organization with its principal place of business in Greenbelt, Maryland.  Prior to the commencement of the instant Chapter 11 bankruptcy case by Doctors Health, Inc., debtor herein, creditor included among its members approximately 14,000 Medicare beneficiaries in the Maryland/Virginia area.  The parties entered into a certain Administrative Service Provider Contract for Medicare Global Risk Services dated September 30, 1997 ("the Global Risk Agreement") and a certain Medicare Network Management Agreement

2

---

dated October 1, 1997 ("the 'Administrative Agreement"), collectively referred to as the "Creditor Agreements."  Pursuant to the Creditor Agreements, NYLCare agreed to make monthly payments (the "Capitation Payments") to Doctors Health in an amount equal to a fixed percentage of the monthly payments received by NYLCare from the federal Health Care Financing Administration ("HCFA") in exchange for Doctors Health's assumption of total responsibility for the cost of substantially all of the benefits (the "Covered Services") which were provided to members under NYLCare's Health Care Plan.  NYLCare retained the obligation to advance payments on account of the costs of the Covered Services subject to its right to offset such payments against the monthly Capitation Payments and Doctors Health's obligation to reimburse NYLCare to the extent that the expenses of the Covered Services exceeded the amount of the Capitation Payments.

Since the implementation of the Creditor Agreements effective October 1, 1997, the cost of the Covered Services assumed by Doctors Health far exceeded the Capitation Payments owed by NYLCare to Doctors Health such that, after the application of the Capitation Payments against such costs and the application of the proceeds of a letter of credit in the amount of $5,250,000 provided as security by Doctors Health to NYLCare pursuant to the Creditor Agreements, NYLCare has actually paid claims to providers which should have been paid by Doctors Health under the Creditor Agreements in the total amount of $26,905,376.15, as follows:

| MONTH | AMOUNT |
|---|---|
| December 1998 | $ 2,240,551.92 |
| January 1999 | 6,447,209.94 |
| February 1999 | 7,911,609.96 |
| March 1999 | 4,712,433.52 |
| April 1999 | 1,531,840.43 |
| May 1999 | 932,948.24 |
| June 1999 | 971,421.32 |

3

This complaint is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B),

(C), (F) and (O)[3], because it is essentially an objection and a counterclaim filed by the

| | |
|---|---|
| July 1999 | 557,397.93 |
| August 1999 | 694,074.64 |
| September 1999 | 192,883.02 |
| October 1999 | 264,460.42 |
| November 1999 | 131,352.51 |
| December 1999 | 137,192.30 |
| | |
| TOTAL | $26,905,376.15 |

Further, as of December 31, 1999, NYLCare estimated that additional claims for services performed by providers prior to the termination of the Creditor Agreements which have been incurred but not yet paid ("IBNR") total $2,890,673.22.

In violation of the Creditor Agreements, and despite timely demand, Doctors Health has failed to pay NYLCare amounts owed as a result of the payments made to date as well as the IBNR claims which total $29,796,049.37.

Dated March 30, 2000                          /s/ Brian Kean, General Manager

[3]Section 157 (b)(2)(A), (B),(C), (F) and (O) provides as follows:

(2) Core proceedings include, but are not limited to–

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

4

debtor to the claim filed by NYLCare, arising from the same transaction, which the complaint seeks to avoid, disallow or equitably subordinate, based upon the defendant's misconduct alleged to have tortiously injured and destroyed the debtor's business and caused it to file bankruptcy. *Kline v. Ed. Zueblin, AG (In re American Export Group Intern. Svs., Inc.),* 167 B.R. 311, 315 (Bankr.D.D.C.1994); *Cf. Katchen v. Landy,* 382 U.S. 323, 337, 86 S. Ct. 467, 477, 15 L. Ed. 2d 391 (1966). NYLCare subjected itself to the core jurisdiction of this Court, by reason of having filed a claim against the debtor in the instant bankruptcy case. *176-60 Union Turnpike v. Howard Beach Fitness Ctr., Inc.,* 209 B.R. 307, 311 (S.D. N.Y. 1997). For the reasons stated, the objection will be sustained, the defendant's claim will be disallowed in its entirety and damages will be awarded to the plaintiff for breach of contract in the amount of $21,300,000.

THE PARTIES

_____

> (C) counterclaims by the estate against persons filing claims against the estate;
>
> (F) proceedings to determine, avoid, or recover preferences;
>
> (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

28 U.S.C. § 157(b)(2)(A), (B), (C), (F) and (O).

Medicare is a federal health insurance program enacted to provide medical care to eligible elderly and disabled patients.  See 42 U.S.C. § 1395(c) and (d).  The program is administered by the Health Care Finance Administration ("HCFA").  *See* Keith J. Shapiro etal, Health Care Bankruptcy Cases, *Norton, Annual Survey of Bankruptcy Law 1999-2000*.  As HMO, NYLCare had a contract with HCFA to provide health services to Medicare enrollees in the form of a health maintenance plan known as the "NYLCare 65 plan," in return for a per member per month premium from HCFA.  Jeff Douglas Emerson ("Emerson") was the chief operating officer of NYLCare.  Susan Lefkowitz ("Lefkowitz") was its executive vice president.  NYLCare was an indirect subsidiary of New York Life Insurance Co. ("New York Life") and part of New York Life's health care business ("NYLCare Corporate").  NYLCare Corporate was divided into operating subsidiaries defined by different geographic markets.

Doctors Health was a publicly-traded Delaware corporation with its principal place of business in Maryland, in the business of managed health care as a physician practice management company ("PPM ") and as an Administrative Service Provider ("ASP")[4], that provided health services through a network of primary care physicians

---

[4]As stated in a recent decision of the Maryland Court of Appeals,

("PCPs"), specialists, hospitals and others.  Between 1995 and 1998, Doctors Health

---

An ASP obviously acts as an intermediary between the HMO and its members, as well as between the HMO and the doctors and hospitals who actually provide the medical and hospital services to the HMO's members.  Absent an ASP, the relationship in an HMO situation is a tripartite, and essentially triangular, one:  the members pay a capitation fee to the HMO to assure the provision and cover the cost of the agreed-upon range of hospital and medical services;  the HMO employs or contracts with doctors and hospitals (and other direct health care providers) to provide those services;  the doctors and hospitals provide the service to the HMO members and are paid by the HMO.  *See Riemer v. Columbia Medical,* 358 Md. 222, 230-31, 747 A.2d 677, 681-82 (2000).

A principal function of an ASP, in an economic sense, is to "downstream" some of the HMO's risk.  In return for a capitation payment by the HMO, the ASP assumes responsibility for procuring and paying the hospitals, doctors, and other health care providers who actually provide the medical services that the HMO is obliged to provide for its members.  The insertion of an ASP intermediary thus required  some refinement or redefinition of the statuses of the HMO and the direct health care providers *vis á vis* each other. Under an ASP arrangement, the HMO and the ultimate providers, who otherwise would look to each other for the provision of the service, on the one hand, and payment for the services provided, on the other, each look to the ASP for both.  That insertion, which is of relatively recent origin, also raised some legislative concerns regarding the assurances that (1) the services
called for in the HMO-member agreement would, in fact, be provided, and (2) the direct providers of the service would be paid.

*Dimensions Health Corp. v. Maryland Ins. Admin.,* 374 Md. 1, 6, 821 A.2d 40, 43-4 (2003).  Doctors Health was determined to be an ASP by Judge Martin Teel, sitting by designation, in the case of *In re Doctors Health, Inc.,* 238 B.R. 594, 603 (Bankr. D. Md. 1999), *aff'd,* 249 B.R. 99 (D. Md. 1999).

established a provider network of thousands of physicians and specialists in Maryland, Virginia and the District of Columbia, and had contracted with HMOs and insurance companies for its physicians to provide medical services to their enrollees. By June 30, 1998, Doctors Health had a network of 10,970 physicians in the three jurisdictions, that included 2,570 PCPs and 8,400 specialists. Debtor's Amended Disclosure Statement [P. 383], with annual revenues of at least $100 million and responsibility for approximately 25,000-30,000 patients. The debtor's management included its founders, Drs. Scott Rifkin and Alan Kimmel, as well as Stewart Gold ("Gold"), John Dwyer ("Dwyer") and Theresa Spoletti

In 1995, Doctors Health received $3.5 million from St. Joseph's Medical Center and $4 million from Med-Lantic Management Services, a subsidiary of Medical Mutual Liability Insurance Company of Maryland. In September 1996 and January 1997, it received equity investments totaling $10 million from Genesis Health Ventures ("Genesis"). In addition, Doctors Health had a $5 million credit facility from an affiliate of Genesis. On July 7, 1997, the Beacon Group III-Focus Value Fund, L.P. ("Beacon"), invested $20 million in Doctors Health and agreed to invest an additional $10 million before June 30, 1998, under certain conditions. Plaintiff's Exhibit No. 8.

THE CONTRACT

8

The parties entered into an Administrative Service Provider Contract for Medicare Global Risk Services[5] dated September 30, 1997, (the "Administrative Contract"), Plaintiff's Exhibit No. 18, and a Medicare Network Management Agreement dated October 1, 1997 (the "Network Contract"), Plaintiff's Exhibit No. 20 (collectively the "Contract"), whereby Doctors Health agreed to serve as the exclusive manager to provide medical services to certain of the enrollees in the NYLCare 65 plan and acted as the Medicare network manager for the NYLCare 65 plan for an initial term of three years, commencing October 1, 1997, "unless terminated in accordance with the provisions thereof." Section 7.6 of the Network Contract incorporated the terms of the Administrative Contract and provided that in the event of a conflict the Network Contract shall control . Section 7.7 provided that Maryland law should govern "the validity, interpretation and performance of this Agreement." *Id.*[6]

The parties specifically agreed to a multi-year term because they did not expect the Contract to be profitable in its first year due to the time required to invest in Doctors Health's infrastructure and because Doctors Health did not expect its medical

---

[5]Global risk contracts are those in which defined health care services are provided in return for a fixed amount per member per month ("PMPM"), regardless of actual costs.

[6]The applicable Maryland statute is Section 19-701 *et seq.*, of the Health-General Article of the Maryland Annotated Code (the "Maryland Health Maintenance Organizations Law").

loss ratio ("MLR")[7] to reach a favorable level in the first year.  The parties understood

that the Contract required Doctors Health to invest an enormous amount of time and

resources that might adversely compromise Doctors Health's pre-existing relationships

with other payors.[8]  Memorandum of Understanding (Letter of Intent), dated September

10, 1997.  Plaintiff's Exhibit No. 13.

PROVISIONS OF THE CONTRACT RELATING TO TERMINATION

The Network Contract permitted the termination of the Contract by either party

"for cause" in Section 7.2,[9] "by agreement" in Section 7.4, and/or because of

---

[7]A quotient used in the industry to determine the ratio of medical expenses to revenue.

[8]"NYLCare accounted for approximately 60% of the debtor's revenue from global capitation contracts."  Debtor's Amended Disclosure Statement, p. 5 [P. 383].

[9]Section 7.2 provided specific grounds for "cause":

(a) Failure to maintain any insurance required under this Agreement;

(b) Dissolution, termination of existence, insolvency or business failure of either party, commission of any act of bankruptcy by, or appointment of a receiver or other legal representative for any party of the property of either party;

(c)  Assignment for the benefit of creditors or commencement of any proceeding under and (sic) bankruptcy or insolvency law by or against any party, entry for an order for relief against either party;

(d) In the event of a liquidating distribution to the either party's shareholders (or similar event);

(e) Any purported combination, consolidation or merger of the a (sic) party into another entity, in a transaction where such party is not the surviving entity under applicable law; provided however, that an initial public offering shall not be considered grounds for termination of the Agreement;

(f) Any sale or issuance of a party's securities that places a majority of the voting power of such shares in the control of persons or entities not having such control on September 30, 1997;

(g) Any sale, exchange, or other disposition of all or substantially all of the other party's assets;

(h) Any change in a party's upper management personnel, if such management personnel was key to the continuation of this Agreement and the absence of such management personnel would frustrate the continued provision of the products and services contemplated by this Agreement;

(I) If a party proposes to act or conducts itself in such a manner as to directly compete with the primary business purpose of non-breaching party;

(j) The failure of a party to maintain licenses or certifications required to operate in conformity with this Agreement;

(k) A party engages in such gross misconduct as to reflect negatively on the reputation of the non-breaching party;

(l) If a party, or any of their (sic) respective officers, directors or management employees, is found guilty of a felony, or engages in gross misconduct which directly results in prohibiting the other party from participating in the Medicare program; and

(m) The commission or omission of any act or any conduct or allegation of conduct for which the party's license, certification or accreditation, or

11

"prospective regulatory changes" in Section 7.5.

CONTRACTUAL DUTIES OF NYLCARE

NYLCare – The Administrative Contract provided that NYLCare "shall throughout the term of the Agreement maintain all licenses and accreditations." Section 2.16. The Network Contract required NYLCare to use its best efforts to expand membership in the NYLCare 65 plan during the initial three-year term. NYLCare specifically agreed to "aggressively and in good faith use its best efforts" to engage in a variety of marketing activities designed to expand the number of enrollees in the NYLCare 65 HMO, including television, radio and direct mail advertisements. Section 3.8.

NYLCare was required to collect monthly payments from HCFA and to remit a "Capitation Payment" to Doctors Health on a monthly basis equal to 88.5% of the sum of HCFA's adjusted average per capita cost (the "AAPCC")[10], plus any subscriber or employer premiums (the "Premium"), minus any claims approved for payment by

---

right to participate in the Medicare program, may be subject to revocation or suspension, whether or not actually revoked or suspended, or if the party is otherwise disciplined by any licensing, regulatory, professional entity, or any professional organization with appropriate jurisdiction.

*Id.*

[10]The amount paid by HCFA to cover medical care for a Medicare member.

12

Doctors Health and actually paid by NYLCare for approved medical services for its members..  NYLCare was required to provide a "Monthly Capitation Report" to Doctors Health at the beginning of each month that reflected the Premium for the month and the amount of any paid medical claims for the prior month.  If the Premium exceeded the medical claims properly paid, the report would indicate that Doctors Health was entitled to be paid the excess (the "Capitation Payment") and NYLCare would wire transfer funds to Doctors Health in the amount of the excess.  In the event that properly-paid medical claims exceeded the Premium, the Monthly Capitation Report would indicate the deficit and NYLCare would invoice Doctors Health for the amount of the deficit.[11]

---

[11]    Section 3.4.4 of the Network Contract provided, in pertinent part:

NYLCare shall make timely payment for all claims **approved for payment by Doctors Health** in accordance with provisions of Section 3.4.2(4)(a) above, and in accordance with applicable law and regulation. The claims payments will be reviewed by the parties and reconciled on a monthly basis using mutually agreeable procedures.  The total payment on such claims made to Participating Providers by NYLCare Mid-Atlantic in any calendar month shall be deducted from the compensation due to be paid to Doctors Health under Section 6.1 on the tenth (10th) day of the following month.  In the event that the total amount for **claims paid** by NYLCare Mid-Atlantic exceeds the total compensation due to be paid to Doctors Health for that month, then NYLCare Mid-Atlantic shall invoice Doctors Health for the balance due and Doctors Health shall pay NYLCare Mid-Atlantic within sixty (60) days of the date of receipt of the invoice.

13

Section 9.1 of the Medicare Network Management Agreement provided that the parties did not intend

> . . . to create any relationship between Doctors Health and NYLCare Mid-Atlantic other than that of independent parties contracting for the purpose of effecting provisions of the Agreement. Neither party nor any of their representatives shall be construed to be the agent, employer, employee or representative of the other.

*Id.* Nevertheless, under both the Contract and by statute, Doctors Health was an "administrative service provider," that NYLCare as HMO was required to pay in consideration for its providing health care services to members of the NYLCare 65 Plan, the payments for which NYLCare was liable.

NYLCare was required to pay claims at the lesser of the NYLCare Mid-Atlantic rate, the Medicare rate or the Doctors Health rate in the event that Doctors Health advised it had a lower rate after previewing the claims. Section 3.4.2(2)(e). NYLCare was entitled to draw on a letter of credit to be provided by Doctors Health "**only** to pay the balance **due under Section 3.4.4** following the expiration of the sixty (60) day waiting period." Section 6.4(b).

The Network Contract provided Doctors Health the right to preview claims prior to payment and allowed NYLCare to deduct only those claims approved by Doctors

---

*Id.* [Emphasis added.]

14

Health.   Sections 3.4.4, 3.4.2(4)(a) and 3.4.2(3)(a).   However, it was not until approximately July 8, 1998, that NYLCare provided Doctors Health the opportunity to preview claims.  Plaintiff's Exhibit No. 60.

CONTRACTUAL DUTIES OF DOCTORS HEALTH – Doctors Health agreed to provide medical care to the Medicare patients enrolled in the NYLCare 65 plan and assumed the responsibility for paying the costs of the medical services rendered.

PERFORMANCE OF THE CONTRACT

On October 1, 1997, the parties commenced performance of the Contract.  That they were pleased with the transition of the NYLCare 65 population to the Doctors Health management is supported by the fact that they agreed to have it assume responsibility for NYLCare 65 enrollees in Prince George's County, Maryland, which originally had been excluded from the Contract.  Plaintiff's Exhibit No. 37.  On June 15, 1998, NYLCare again expanded the role of Doctors Health by transferring to it the management of the NYLCare 65 members in Northern Virginia, effective September 1998.  Plaintiff's Exhibit No. 54.

NYLCare made a monthly payment to Doctors Health for each of the months of October 1997 through April 1998, because Monthly Capitation Reports for those months reflected that the Premium due Doctors Health exceeded claims paid by NYLCare.  Plaintiff's Exhibit No. 109.  The total amount of the payments made by

NYLCare to Doctors Health for those months (October 1997 through April 1998, inclusive) was $15,782,464.  Plaintiff's Exhibit Nos. 92, Exhibit at page 03107; Defendant's Exhibit No. 100.

In the Spring of 1998, NYLCare began processing a backlog of claims.  For the first time, claims paid exceeded the Premium because of the high volume of claims that were processed.  The Capitation Report for May 1998 noted that Doctors Health owed NYLCare the sum of $971,951.57.  Plaintiff's Exhibit No. 49.  The June 1998 Capitation Report again reflected that claims paid exceeded the Premium due Doctors Health, this time in the amount of $2,661.222.33.  Added to the deficiency asserted by NYLCare on the May Capitation Report, NYLCare claimed that Doctors Health owed it $3,633,173.90.  Plaintiff's Exhibit No. 50.

Doctors Health objected to the amount demanded by NYLCare because of NYLCare's failure to allow Doctors Health to preview and approve claims prior to payment and because Doctors Health identified certain errors in the payment of claims after consultation between the parties.  Doctors Health also expressed concern that NYLCare had not paid claims at the lowest rate, as required by the Contract. Plaintiff's Exhibit No. 52.

In response, NYLCare offered to resolve the alleged deficiency by the end of June.  Doctors Health began auditing all of its paid expenses under the Contract.  In

16

addition, NYLCare agreed that by July 1, 1998, Doctors Health could preview and approve claims prior to payment, as required by the Contract. The parties were unable to resolve all of the open audit issues by the end of June 1998, but agreed to work together to reach a resolution. Plaintiff's Exhibit No. 57.

On June 29, 1998, the Network Management Agreement was amended by letter agreement, which provided, *inter alia,* that (1) Doctors Health would be paid 83% of the Premium and have no liability for enrollees' pharmacy expenses; (2) a process would be instituted by July 1, 1998, to ensure that Doctors Health could preview and approve claims before their payment by NYLCare; and (3) Doctors Health would pay any paid claim amounts that exceeded the Premium for the month within five days of demand. Defendant's Exhibit No. 140. The parties also agreed to work together to promptly address unresolved issues relating to claims. Upon the execution of the letter agreement, Doctors Health paid NYLCare $3,176,173 to cure the deficit. The modification did not alter the provisions in the Contract relating to its termination.[12]

---

[12]The full text of the June 30, 1998, letter agreement is set forth below:

The following letter of agreement (Agreement) serves as confirmation of our recent discussions in clarifying the terms of the Medicare Network Management Agreement (Original Agreement) dated October 1, 1997 between Doctors Health, Inc. (Doctors Health) and NYLCare Health Plans of the Mid-Atlantic, Inc. (NYLCare Mid-Atlantic). This Agreement will become effective as of the date last signed by a party. Except as expressly set forth in this Agreement, the Original Agreement between the

parties, including any prior amendments thereto, shall remain in full force and effect. Terms used in this Agreement that are defined in the Original Agreement shall have the definitions contained in the Original Agreement, unless they are otherwise defined in this Agreement. This Agreement shall terminate at the same time and under the same terms and conditions as the Original Agreement. In the event of a conflict between the Original Agreement and this Agreement, the terms of this Agreement shall govern.

1. NYLCare Mid-Atlantic and Doctors Health agree to limit the network of providers available to the NYLCare 65 members in so far as those providers available in that network are directly contracted with NYLCare Mid-Atlantic and that network meets HCFA adequacy guidelines and NYLCare Mid-Atlantic access and marketing standards.

2. NYLCare Mid-Atlantic agrees to permit Doctors Health to change the authorization guidelines for the network. Doctors Health will prepare and provide, in a timely fashion, to NYLCare Mid-Atlantic a list of their required changes. NYLCare Mid-Atlantic agrees to review the list and to work, in a timely fashion, with Doctors Health representatives to finalize changes to these authorization guidelines.

3. As agreed previously in writing, Doctors Health may change physician compensation. Any changes must be agreed to by NYLCare Mid-Atlantic, and must be made in accordance with current laws and regulations and with NYLCare Mid-Atlantic's usual timing and process for such changes.

4. In accordance with the Original Agreement, NYLCare Mid-Atlantic understands that Doctors Health may assume full responsibility to perform Health Risk Assessment screening. If, in performing this screening, Doctors Health intends to use member written communication materials, they must be provided to NYLCare Mid-Atlantic for submission to and approval by HCFA.

5. NYLCare Mid-Atlantic agrees to implement a process to enable Doctors Health to preview claims prior to payment. This process will be implemented on July 1, 1998, provided that a mutually agreed upon process, with a maximum turn-around-time of five (5) calendar days for previewing and three (3) calendar days for resolving disputed claims, can be developed.

18

_____

6.  In accordance with the original Agreement, both parties agree to provide to the other, in a timely fashion, those reports necessary for the successful functioning of the respective organizations to comply with the Original Agreement and this Agreement.

7.  NYLCare Mid-Atlantic agrees to continue to submit to HCFA, in a timely fashion, Utilization Management and other materials required for review.  Doctors Health agrees to cooperate with this requirement.

8.  NYLCare Mid-Atlantic agrees to assign a staff member to ensure the implementation of a computer terminal port on the grounds of Doctors Health for the purposes of reviewing claims.  By July 1, 1998, NYLCare Mid-Atlantic will communicate to Doctors Health the requirements for implementation.

9.  In accordance with the original Agreement and the accompanying Delegation of Utilization Management Agreement, Doctors Health agrees to comply with the requirement for reporting, notification of significant changes of staff, and adequate access for oversight of utilization management and related activities.

10.  Upon execution of this Agreement, Doctors Health will remit, by June 30, 1998, to NYLCare Mid-Atlantic via wire transfer the amount of $3,625,692.74, which constitutes the total deficit indicated in the Monthly Capitation Calculation Report (Report) for the months of May and June 1998.  NYLCare Mid-Atlantic agrees to cooperate with an audit of the claims paid that are the basis of this amount and will, if any adjustments are mutually agreed to, reflect corrected amounts on the subsequent month's Report.

11.  Every month throughout the term of the Original Agreement, Doctors Health shall pay to NYLCare Mid-Atlantic any deficits reflected in the Report generated by NYLCare Mid-Atlantic.  Any such funds shall be payable via wire transfer within five (5) business day sof Doctors Health's receipt of the Report.

12.  NYLCare Mid-Atlantic and Doctors Health will work together on an ongoing basis to reconcile the Reports.  Any resulting adjustment swill be reflected in the subsequent month's Report.

19

THE SALE OF NYLCARE TO AETNA U.S. HEALTHCARE

In March 1998, New York Life announced that it was going to sell NYLCare Corporate to Aetna U.S. Healthcare ("Aetna"). Press Release dated March 16, 1998, Plaintiff's Exhibit No. 46. As yet unbeknownst to Doctors Health, but understood by Emerson, Aetna had plans to employ a completely different business strategy and management model with respect to NYLCare's operations. Testimony of Emerson, Transcript at 581-3. By July 15, 1998, Aetna completed its acquisition of NYLCare Corporate. Press Release dated July 15, 1998, Plaintiff's Exhibit No. 63.

In late July and early August of 1998, NYLCare recommended to Aetna that Doctors Health's role be expanded further by transferring to Doctors Health the management of an additional 11,000 enrollees in a Medicare plan operated by Aetna. Testimony of Emerson, Transcript at 584.

During the summer of 1998, Aetna decided to exit the Medicare market in a number of states and particular counties, after it had conducted a nationwide review of the Medicare markets on a state-by-state basis, concluding that those geographic areas did not show sufficient profit potential. Testimony of S. Harmon-Weiss, Transcript at

---

If you are in agreement with these terms, please sign below and return the executed copy to me.

*Id.*

20

788-92.  On August 31, 1998, Aetna announced that it would terminate both the Aetna Medicare Plan and the NYLCare 65 Plan in Maryland, the District of Columbia and Virginia, effective December 31, 1998.  Plaintiff's Exhibit No. 87.  On August 24, 1998, Aetna notified HCFA of its decision.  Doctors Health was informed of the decision by Emerson and Lefkowitz on August 27, 1998.  Testimony of Gold, Transcript at 460-2.

The claims preview process was not implemented by July 1, 1998 as agreed, and the July Capitation Report [Plaintiff's Exhibit No. 58] was not subjected to a claims preview by Doctors Health, nor were many of the claims that were included in the August Capitation Report.  Plaintiff's Exhibit No. 71.  When a meaningful claims preview began in August 1998, Aetna was on the verge of terminating the Contract.

The July 1998 Monthly Capitation Report reflected that paid claims in June 1998, exceeded the Premium due Doctors Health for July by $2,615,208.69.  Because the claims previewing process had not begun by July 1, 1998, as agreed, disputed claims that were to have been resolved through he audit process were still outstanding.  Letter dated July 7, 1998, from Emerson to Stewart B. Gold and John Dwyer, Jr., Plaintiff's Exhibit No. 60.

On July 14, 1998, Gold and Emerson met and Emerson agreed that he would be flexible in permitting Doctors Health to pay monies over a longer period than the five-

21

days provided for in the June 29 modification, as long as the "cumulative amount owed by Doctors Health to NYLCare did not exceed the amount of the Irrevocable Letter of Credit." This concession was confirmed by Emerson in a letter to Gold dated July 17, 1998. Plaintiff's Exhibit No. 64.

Through the end of July, the parties attempted to resolve outstanding claims issues and implement a claims preview process. Negotiations continued regarding modification of the Premium percentage to be paid to Doctors Health, the risk assumed by Doctors Health under the Contract on a going forward basis and changes to other NYLCare 65 Plan features, including member premiums and benefit levels. Correspondence between the parties and memoranda, Plaintiff's Exhibit Nos. 65-69.

The August 1998 Capitation Report [Plaintiff's Exhibit No. 71] reflected that the capitation payment due Doctors Health for August exceeded claims paid in July 1998, and therefore, that NYLCare owed Doctors Health $506,068.53 for that month. The August report was the first monthly report implemented after a claims preview process had been instituted by NYLCare for a substantial portion of the month. Combining the amounts from both the July and August Capitation reports, the cumulative net amount purportedly owed by Doctors Health was reduced to $2,109,140.16, subject to further reductions pending resolution of the existing disputes under discussion. *Id.*

On August 13, 1998, Lefkowitz sent a letter to Gold on behalf of NYLCare, that included the statement, "This letter is official notification of breach of Section 11 of the Letter Agreement between NYLCare Mid-Atlantic and DH dated June 29, 1998." She also asserted that "Because the payment period has now exceeded the five (5) days allowed, and because the total amount outstanding (deficit plus claims inventory) exceeds the Letter of Credit (LOC) which DH holds, we are forced to request that you comply with the Letter of Agreement and submit, via wire transfer, all amounts owed. The full amount owed at this time is $2,615,208.69, less the $506,068.53 surplus from the August report, or $2,109,140.16 in total." Plaintiff's Exhibit No. 78. The letter did not indicate that Mr. Emerson had changed his position set forth in the July 14 letter that he would be flexible in enforcing the five-day deadline that Doctors Health was given to make payments under the letter agreement on the condition that the "cumulative amount owed by Doctors Health to NYLCare did not exceed the amount of the Irrevocable Letter of Credit." This despite the fact that the letter of August 13 indicated that the cumulative amount owed by Doctors Health was only $2,109,140.16, substantially less than the $5.2 million letter of credit. *Id.* By letter dated August 17, 1998, Stewart Gold acknowledged his receipt of the notification of the "alleged breach," but stated that Doctors Health would not remit payment to NYLCare because the sum demanded remained in dispute. Plaintiff's Exhibit No. 79.

23

On August 19, 1998, representatives of the parties met to address resolution of outstanding disputes.  Afterward, by letter dated August 21, 1998, Emerson noted that the meeting was helpful and thanked Gold and Wilkinson for their "cooperation and patience as we work through together the issues facing Doctors Health and NYLCare." Plaintiff's Exhibit No. 81.

Realizing the dramatic impact that Aetna's decision to cancel the NYLCare 65 plan would have on Doctors Health, Emerson and Lefkowitz personally visited Gold on August 27, 1998, and advised him of Aetna's decision to terminate the contract, four days before Aetna publicly announced its decision to exit the Medicare market. A press release issued by Aetna U.S. Healthcare, dated August 31, 1998, indicated that it had notified HCFA that it would sponsor Medicare programs in 16 states, but that it would no longer provide such service in six enumerated states, including Maryland, the District of Columbia and assorted counties in the states of Connecticut, California and Florida.  On the same day, Gold sent a letter to Emerson, dated August 31, 1998, Plaintiff's Exhibit No. 86, which stated in part, that "Aetna's announcement today that it will abandon the Medicare business covered by our contract is like a death blow to us."  The letter also provided written notice to NYLCare that there was "no legal basis for terminating [the Contract] simply because Aetna wants to get out of that business in selected areas, including ours."  *Id.*

Aetna gave no consideration to the question of whether the Contract permitted a termination of the NYLCare 65 plan prior to the end of Doctors Health's three-year agreement to manage the NYLCare 65 plan. The general counsel for Aetna testified that the "contract was a non-issue with respect to the decisions. It was nothing that would stand in the way. . ." Testimony of David Simon, Transcript at 736.

Doctors Health initiated discussions with Aetna in an effort to salvage the opportunity to manage the enrollees in the NYLCare 65 Plan. In early September 1998, Gold and a team of Doctors Health representatives met with representatives of Aetna at Aetna's offices in Pennsylvania in an effort to have Aetna reconsider its decision to withdraw from the Mid-Atlantic Medicare market. Eric Wilkinson from Beacon also attended, prepared to tell Aetna that Beacon would provide financial support to Doctors Health if Aetna would reconsider terminating the Contract. The effort failed. Aetna invited Doctors Health to sue. Testimony of Stewart Gold, Transcript at 464-7, and Eric Wilkinson, Transcript at 492-4.

On September 1, 1998, one day after the public announcement that the NYLCare 65 Plan was going to be terminated, NYLCare altered the method of making monthly payments to Doctors Health for the first time since the inception of the Contract. In the September Monthly Capitation Report, Plaintiff's Exhibit No. 88, NYLCare deducted from the Capitation Payment due Doctors Health both paid claims and an estimate of

incurred but not reimbursed claims (the "IBNR Claims") in the amount of $10,691,965.[13]

Doctors Health was entitled to a capitation payment for September 1998 in the amount of $1,787,689, absent the inclusion of IBNR Claims. If the $2.1 million due from August were included, with appropriate adjustments as reflected in the amended September 4, 1998 Monthly Capitation Report, the net owed to NYLCare would have been approximately $321,000. Instead, the September Monthly Capitation Report indicated that Doctors Health owed NYLCare $8,904,276. *See* NYLCare Internal Memorandum, dated September 4, 1998, acknowledging underpayment to Doctors Health in the amount of $44,644. Plaintiff's Exhibit No. 89.

NYLCare undertook efforts to draw on the letter of credit. On September 4, 1998, it submitted a statement to Chase that it was aware of no defenses or offsets to payment that Doctors Health had raised. NYLCare demanded a draw of $2,615,208.69 against the letter of credit. Letter dated Sewptember 4, 1998, from Nannette G. Henderson, Executive Vice President and Chief Financial Officer of NYLCare, to Chase Manhattan Bank, Plaintiff's Exhibit No. 91. The inclusion of IBNR Claims in

---

[13]IBNR is an estimate of claims to be paid in the future. It is an accounting term that is used to anticipate that members of health plans are incurring services that will have to be paid in the month when services are rendered but the bill has not yet been received so an estimate is made as to the amount of the obligations.

the September 1998 Capitation Report furnished a pretext to NYLCare to draw against the letter of credit.[14]

By its terms, the letter of credit could be drawn upon only if NYLCare submitted a statement representing that Doctors Health owed NYLCare a specific sum of money under Section 3.4.4 of the Network Contract, the amount owed had been invoiced to Doctors Health, Doctors Health was in receipt of such invoice for at least 60 days and Doctors Health had raised no defenses or offsets to payment, of which NYLCare was aware.

NYLCare made the draw request despite its knowledge of the following issues which had been raised by Doctors Health: (1) the $506,068 Capitation Payment earned by Doctors Health as reflected in the August 1998 Monthly Capitation Report; (2) the $1,787,689 Capitation Payment earned by Doctors Health as reflected in the revised September 1998 Monthly Capitation Report; and (3) the $247,013 in claims payment which NYLCare agreed were improper. Emerson directed the first draw request. At that time he knew that Doctors Health had protested the amount that NYLCare asserted was due. Throughout September, Doctors Health provided written notice to NYLCare

---

[14]Section 3.4.4 of the Contract provided that NYLCare could invoice Doctors Health only for the excess of "claims paid" in excess of premium owed to Doctors Health. Section 3.4.4. did not authorize NYLCare to invoice Doctors Health for IBNR Claims.

and Chase that it protested the amounts that NYLCare asserted were due.  Plaintiff's Exhibit Nos. 92, 94, 95 and 98. Disregarding these notices, NYLCare proceeded to draw against the letter of credit.  Ms. Henderson, who sent the draw request letter to Chase, testified at trial that she would not have sent the letter had she known that Doctors Health had raised any defense or offsets to NYLCare's asserted claims. Testimony of N. Henderson, Transcript at 739.  Jeff Emerson, who directed that the draw requests be made, was well aware of the protests by Doctors Health at the time. Testimony of Emerson, Transcript at 617-18.

After delaying payment on the letter of credit due to legal proceedings concerning NYLCare's draw request, Chase ultimately honored the draw request despite Doctors Health's efforts to obtain an injunction to prevent the draw.  Notice of draw on the letter of credit, Plaintiff's Exhibit No. 103.

The minimum amount by which NYLCare was overpaid as a result of the first improper draw request in September 1998, was $2,293,758.01.  If Aetna had demanded the appropriate payment from Doctors Health, exclusive of IBNR Claims, Doctors Health could have paid the actual deficit of $321,450, from its working capital and the letter of credit would have remained inviolate.  Testimony of John Dwyer, Transcript at 326.

On October 21, 1998, NYLCare made a second demand on Chase for the balance of the letter of credit, Plaintiff's Exhibit No. 105, which Chase honored. Notice of draw on the letter of credit, dated October 28, 1998, Plaintiff's Exhibit No. 106. The minimum amount by which NYLCare was overpaid in connection with the October 1998 draw request was $1,752,943.53. NYLCare did not provide Doctors Health with a copy of the October 21, 1998 draw request. The letter of credit was due to expire on October 31, 1998. In light of NYLCare's impending termination of the Contract, it is obvious that Doctors Health would not have renewed the letter of credit at its expiration. Testimony of John Dwyer, Transcript at 326.

Following payment of the letter of credit, Chase repaid itself with the $5,250,000 cash deposit of Doctors Health that had served as collateral for the letter of credit.

Beacon was scheduled to make its second investment in Doctors Health in the amount of $10 million on or before June 30, 1998. Beacon delayed that investment pending the negotiations between Doctors Health and NYLCare, including the discussion concerning the structure of the monthly payment to Doctors Health going forward.

Because of the substantial revenues from the NYLCare contract and the resources that Doctors Health committed to that contract, the NYLCare contract was indispensable to the financial viability of Doctors Health. The draws by NYLCare of

29

Doctors Health's letter of credit in the amount of $5,250,000 were financially devastating to Doctors Health, and ensured that Beacon would not invest additional capital into the company, which it did not do.  The notice of prospective termination of the Contract was followed by a mass exodus of Doctors Health employees, both rank and file and managerial staff.

Meanwhile, on September 24, 1998, Doctors Health sent notice of its immediate rescission of the Contract by letter to NYLCare via fax and overnight mail.  Letter from Stewart Gold to Jeff Emerson, Plaintiff's Exhibit 100.[15]

---

[15]The complete text of the letter follows:

Doctors Health hereby notifies NYLCare Health Plans of the Mid-Atlantic, Inc., that the decision to cancel the NYLCare 65 HMO, effective December 31, 1998, frustrates the essential purpose of the Doctors Health/NYLCare contract.  Doctors Health has a three-year contract to manage the NYLCare 65 HMO, and NYLCare has an obligation to use its best efforts during the term of the contract to work to increase the number of enrollees in the HMO.  NYLCare's decision to terminate all of the enrollees is a material breach of paragraph 3.8 of the contract, and frustrates the very essence of the parties' three year contract.

Because of NYLCare's foregoing breaches, Doctors Health hereby immediately rescinds its contract with NYLCare, and offers to return the benefits to NYLCare which it has received under the contract, thereby entitling Doctors Health to receive the return of all benefits it conferred upon NYLCare as a result of the contract, and to be reimbursed its expenditures under the contract.  This course of action places the parties in exactly the position they would have been had no contract been made.  It is my understanding that Maryland law provides for such a result.

_____

Washington Homes, Inc. v. Interstate Land Development Co._, 382 A.2d 555 (Md. 1978).

In order to return NYLCare to the position it occupied prior to the contract, Doctors Health proposes to return to NYLCare all monies which have been advanced to Doctors Health under the contract, and which have not previously been repaid to NYLCare.  As set forth in Exhibit A, such return premiums total $12,509,301.98.

In order to return Doctors Health to the position it occupied prior to the contract, Doctors Health is entitled to the return from NYLCare of all benefits which NYLCare received as a result of the Doctors Health contract, including but not limited to, NYLCare's reacquiring sole liability for all medical expenses, and benefit NYLCare received to its sale value as a result of the Doctors Health contract, and reimbursement for all expenditures which Doctors Health has made in connection with the contract.  In order for Doctors Health to calculate the increase to NYLCare's sale value, NYLCare will need to provide information to Doctors Health regarding the valuation utilized for Aetna/US Healthcare's purchase of NYLCare.  The expenditures which Doctors Health incurred in connection with the contract include $1,929,702 in capital costs relating to the capital investment in the NYLCare contract, and $9,110,583 in operating expenses allocated to the performance of the NYLCare contract.  If you have any questions regarding these numbers, or in any way do not believe Doctors Health is entitled to reimbursement of these costs, please notify me of your reasons in writing immediately.

Based on the foregoing, Doctors Health can provide NYLCare a payment for $12,509,301.98 (which could be satisfied, in part, by a release of the letter of credit) provided NYLCare agrees to provide Doctors Health a simultaneous payment of $11,040,286, plus any amount attributable to NYLCare's increased sale value as a result of the Doctors Health contract, and a statement that NYLCare has reacquired sole liability for all medical expenses.  This would allow each party to be restored to the relative positions that existed before the contract was

Doctors Health and its investors explored various means of restructuring to save

the business.   Although Beacon and Genesis provided Doctors Health with bridge

---

negotiated, as NYLCare will get all the HCFA premiums and medical expenses and Doctors Health will be reimbursed the benefits it provided NYLCare and its expenditures relating to the contract.

Please advise me in writing immediately as to whether NYLCare agrees with Doctors Health's analysis of what is necessary to restore the parties to the status quo which existed prior to the contract.  If NYLCare believed that a different method is appropriate for restoring the parties to the status quo which existed prior to the contract, please advise Doctors Health of such a method immediately.   NYLCare's cooperation in promptly resolving resolution of this matter is important to the continued viability of Doctors Health.  Accordingly, we would request NYLCare's prompt response.

As a result of Doctors Health's decision to rescind immediately the parties' contract, please be notified that Doctors Health will provide transition services through October 1, 1998.  NYLCare officials should immediately contact Doctors Health to arrange for services previously provided by Doctors Health to be provided in the future by NYLCare or its designee.  As a result of NYLCare's decision to frustrate the purpose of Doctors Health's contract, Doctors Health will be promptly laying off employees, and will not have people available to handle management of the NYLCare 65 HMO.

Doctors Health regrets that such action is necessary as a result of NYLCare's improper actions.

Thank you for your immediate attention to this matter.

*Id.*

32

financing in September and October 1998, restructuring was impossible because of the precipitous means by which NYLCare terminated the Contract, included unpaid claims on the September capitation report and drew on the letter of credit, further depleting Doctors Health's assets.

On November 16, 1998, Doctors Health filed a voluntary Chapter 11 bankruptcy petition in this Court. Of the $19,150,000 originally claimed by NYLCare, $7,400,000 represented claims paid by NYLCare for the month of June 1998 and prior months, while $17,150,000 represented IBNR, after crediting Doctors Health for $5,400,000, representing the letter of credit proceeds. The amended proof of claim reshuffled the numbers to allege that of the new claim amount of $29,796,049.37, $26,905,376.15 represented actual claims paid. The difference, $2,890.673.22, was the new estimated IBNR.

On July 14, 1999, the debtor filed the instant 12-count complaint against NYLCare to avoid and recover preferential transfers, to avoid and recover improper setoffs, for breach of contract, wrongful and fraudulent draw on a letter of credit, conversion, fraud, negligent misrepresentation, intentional interference with prospective business advantage, equitable subordination of claim and rescission of contract.

33

On January 27, 2000, the debtor filed an objection [P. 372] to Claim No. 9 of NYLCare in the amount of $19,150,000, based upon the same grounds set forth in the instant complaint.

On December 23, 1999, the debtor filed its Chapter 11 plan of liquidation [P. 357], which this Court confirmed by order [P. 416] entered on April 7, 2000.[16] Thomas F. Mapp was appointed disbursing agent pursuant to the debtor's confirmed plan of liquidation. The plan specifically provided that this Court shall have continuing jurisdiction to decide the pending adversary proceeding. Plan, §7.8. It also provided than on the effective date of the plan, any executory contracts and unexpired leases not theretofore assumed by the debtor were deemed rejected, except those in which the debtor was entitled to receive payments. Plan, §5.1.

On August 17, 2000, this Court's denial of NYLCare's motion to dismiss complaint and to compel arbitration was affirmed by order of the U.S. District Court (Garbis, D.J.), on the grounds that the controversy was no longer subject to arbitration

---

[16]NYLCare filed a ballot rejecting the plan and asserted its claim in the amount of $19,150,000. Because of the debtor's pending objection to the claim, and because NYLCare did not seek an order temporarily allowing the claim for voting purposes, NYLCare was not eligible to vote and its rejection was not counted in the tally of ballots that the Court considered in granting the plan confirmation. *See* Bankruptcy Code Sections 502(a) and 1126(a); *Bell Rd. Inv. Co. v. M. Long Arabians (In re M. Long Arabians),* 103 B.R. 211, 215 (9th Cir. BAP 1989).

because the nature of the controversy between the parties, though originally a simple breach of contract dispute, now implicated the administration of the debtor's bankruptcy estate, which was subject to the core jurisdiction of the bankruptcy court to determine the allowance or disallowance of the defendant's claims. *Id.*

By the time of the trial of this complaint, the disbursing agent had proceeds from the liquidated assets of the debtor in the approximate amount of $4.7 million. Plaintiff's Exhibit No. 115.

CONCLUSIONS OF LAW

I.

THE CONTRACT WAS EXECUTORY ON THE DATE OF FILING

The date a bankruptcy petition is filed is the critical time for determining whether a contract is executory. *Enterprise Energy Corp. v. U.S. (In re Columbia Gas Sys. Inc.),* 50 F.3d 233, 240 (3d Cir.1995). On November 16, 1998, the date of filing, the Contract between NYLCare and Doctors Health remained executory, absent the breach by NYLCare, because of the continuing nature of the duties imposed upon the parties[17]

---

[17]"Although the Bankruptcy Code does not define 'executory contract,' the Code's legislative history states that this term 'generally includes contracts on which performance remains due to some extent on both sides.' H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1978); S.Rep. No. 989, 95th Cong.2d Sess. 58 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5844, 6303. *See also Sharon Steel Corp. v. National Fuel Gas Distribution Corp.,* 872 F.2d 36, 39 (3d Cir.1989). A Medicare provider agreement easily fits within this definition." *University Medical Center v. Sullivan (In*

35

by both the Contract and statutory regulation,[18] thereby subjecting the Contract to the provisions of Section 365 of the Bankruptcy Code.  *See* Countryman, Executory Contracts in Bankruptcy:  Part I, 57 Minn.  L. Rev. 439, 460 (1973).  However, because of the fact that the managed health care industry is so heavily regulated, applicable nonbankruptcy law would have prevented Doctors Health from assigning the contract to a different ASP, Doctors Health could not have assumed the Contract with NYLCare, even had it so desired.  *Cf. RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.),* 361 F.3d 257 (4th Cir. 2004) (Applicable nonbankruptcy law excused software licensor from accepting performance from entity other than the debtor in possession, and therefore debtor could neither assume nor assign executory software license).  Nevertheless, this Court has found no authority to require that Doctors Health be able to assume the Contract in order to sue NYLCare for breach of contract, where such breach is its defense to the NYLCare claim.

A breach of contract is not the equivalent of the termination of a contract.  If it were, a debtor in breach of an executory contract or unexpired lease would not be able assume them in bankruptcy, which it may do in the usual situation by curing the breach,

_____

*re University Medical Center),* 973 F.2d 1065, 1075, n. 13.  See also *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1045 (4th Cir.1985).

[18]See Sections 19-712 and 19-713.2 of the Maryland HMO Act.

pursuant to Section 365(b)(1).[19]  While a material breach of the Contract would excuse the non-breaching party from any further performance, it would not terminate the Contract itself, which had a stated duration of three years.

It is the generally accepted rule that "[i]n the case of a bilateral contract for an agreed exchange of performances, a repudiation of his duty by one of the parties terminates the duty of the other.   It gives to the latter the legal privilege of refusing to render the return performance; if sued for such refusal, the plaintiff's repudiation is a good defense."  4 Arthur Linton Corbin, *Corbin on Contracts* § 975 (1951 & 1999 Supp. by Lawrence A. Cunningham & Arthur J. Jacobson).  *Quoted in Federal Deposit Ins. Corp. v. S.A.S. Associates,* 214 F.3d 528, 532-3 (4th Cir. 2000).

## II.
## THE CONTRACT WAS IMPROPERLY TERMINATED BY NYLCARE

NYLCare asserted that it was excused from performing under the contract with Doctor's Health, including its renewal of the HCFA contract, because  Doctors Health materially breached the contract first.  This was the pretext adopted by NYLCare  as an excuse for its wrongful termination of the Contract.   Another invalid defense adopted by NYLCare was the canard that it was excused from performing under the

---

[19]A  bankruptcy trustee [which term includes a debtor in possession], "subject to the court's approval, may assume or reject any executory contract of the debtor." 11 U.S.C. § 365(a).

contract because of a prospective regulatory change in the Medicare program, namely the passage of the Balanced Budget Act of 1997, Pub. L. No. 105- 33, 111 Stat. 275-330 (1997).

If that were the true reason for NYLCare's exit from the Medicare market in Maryland after its takeover by Aetna, the Court poses the rhetorical question of why did Aetna to continue to market its Medicare programs in states and counties other than Maryland after the Act was passed?   The Court finds from the evidence that the true reason for the decision not to renew the HCFA contract was a business decision by Aetna to discontinue its NYLCare65 Plan, which amounted to a breach of contract.

Maryland recognizes that every contract imposes a duty of good faith and fair dealing in its performance.  *7-Eleven, Inc. v. McEvoy,* 300 F. Supp. 2d 352 (D. Md. 2004); *Baker v. Sun Co.,* 985 F.Supp. 609, 610 (D. Md. 1997), *citing Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521, 534, 200 A.2d 166, 173-4 (1964); *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir.2000); *Hrehorovich v. Harbor Hosp. Ctr., Inc.,* 93 Md.App. 772, 789, 614 A.2d 1021 (1992), *cert. denied,* 330 Md. 319, 624 Md. 490 (1993); *P.V. Properties v. Rock Creek,* 77 Md.App. 77, 89, 549 A.2d 403, 409 (1988).  Even though the breach of such duty does not give rise to a distinctly separate cause of action from that of breach of contract, *Eaglehead Corp. v. Cambridge Capital Group, Inc.,* 170 F. Supp.2d 552 (D. Md.

38

2001), a breach of the implied duty of good faith and fair dealing is evidence that will support a cause of action for breach of contract if one party's bad faith conduct prevented the other party from performing under the contract. *Parker v. The Columbia Bank,* 91 Md. App. 346, 604 A.2d 521 (1992).

That is precisely what occurred in the instant case. Pursuant to Section 3.8 of the Contract, NYLCare was obligated to market the program in good faith, which it failed to do by reason of its termination of the Contract. Additionally, NYLCare breached Section 3.4.4 of the Contract when it unilaterally modified the established billing procedure by the inclusion of IBNR on the September 1998 invoice. The Contract required that a monthly capitation payment be tendered to Doctors Health. Doctors Health was obligated to reimburse NYLCare only if the amount of the claims NYLCare actually paid exceeded the amount of the capitation payment due Doctors Health. No capitation report until September of 1998 included the estimated IBNR in calculating the amount due to either party. The inclusion of the IBNR was done for the first time in the month directly following Aetna's termination of the underlying HCFA contract. That inclusion served to enlarge the amount of any deficit owed by Doctors Health to the extent that the deficit that it exceeded the minimum amount that NYLCare could claim to justify drawing down the letter of credit. Without the inclusion of the IBNR on the September capitation report, NYLCare would have had

39

no basis upon which to justify the draw down.[20]  Under the circumstances, this Court infers that the inclusion of IBNR in the September 1998 capitation report was done by NYLCare in an attempt to legitimatize the wrongful termination of the Contract and to draw down the standby letter of credit.

### III.
### THE CONTRACT WAS SUBJECT TO THE EXPRESS CONDITION THAT NYLCARE RENEW ITS UNDERLYING CONTRACT WITH HCFA

The failure of NYLCare to renew its contract with HCFA to provide Medicare services under its NYLCare 65 Plan amounted to a breach of an express condition to the Contract with Doctors Health.[21]  The HCFA contract with NYLCare from which Medicare patient referrals were generated and for which HCFA  paid NYLCare a flat rate per patient, was a one-year contract renewable yearly at the option of the parties. In order for NYLCare to have fulfilled the terms of the three-year contract with Doctors

---

[20]Doctors Health contended that the inclusion by NYLCARE of $10,691,965 in IBNR in the September 1998 capitation report resulted in the debtor owing NYLCare the sum of $8,904,276, instead of its being owed a Capitation Payment of $1,787,689, by NYLCare.

[21]The Network Management Agreement stated in its Preamble:

> WHEREAS, NYLCare Mid-Atlantic is a licensed HMO authorized to market the NYLCare Mid-Atlantic risk product known as NYLCare 65 in the State of Maryland, the Commonwealth of Virginia, and in the District of Columbia[.]

Contract, Plaintiff's Exhibit No. 20.

Health, NYLCare was obligated to renew the underlying contract with HCFA. Consequently, when Aetna purchased NYLCare and announced the non-renewal of the underlying contract in August 1998, less than a year into the three-year contract, it caused NYLCare to breach the contract with Doctors Health by failing to fulfill the essential condition of maintaining the underlying source of the contract at issue. The Court finds that the Contract was made on the express conditions that NYLCare had the ability to perform and that it would not render itself unable to perform by its voluntary non-renewal of the HCFA agreement during the three-year term. Thus, based upon the mutual duties imposed by the Contract upon the parties, the plain language of the Contract, basic principles of contract law, and to give due effect to the intention of the parties this Court concludes that NYLCare was subject to the condition that it maintain its status as a qualified HMO during the three-year term of the Contract.

IV.

THE ANNOUNCEMENT OF NON-RENEWAL WAS A BREACH OF
CONTRACT AT THE TIME NOTICE WAS GIVEN TO THE DEBTOR

The announcement that, effective December 31, 1998, NYLCare would no longer provide Medicare coverage under the agreement with Doctors Health amounted to an anticipatory breach of contract, as of the date of notice to Doctors Health on August 31, 1998. As previously noted, the notice caused a mass exodus of Doctors Health employees, both rank and file and managerial staff.

41

The Contract contemplated an initial period of uncertainty until the business was firmly established and specifically provided for experimentation and negotiation regarding the payment of claims during the first year of the three-year term. The parties contracted for an initial term of three years' duration, which NYLCare terminated without cause by not renewing the underlying Medicare contract with HCFA, which damaged the debtor's business. The termination of the NYLCare65Plan was not only a material breach of the Global Risk Contract between NYLCare and Doctor's Health, it was a substantial one. It was done in bad faith with blatant disregard for the dire consequences to the debtor and its creditors. This may reasonably be inferred from the fact that Doctors Health put NYLCare on notice that its termination of the underlying HCFA contract represented a breach of contract with Doctors Health and that such a breach would consequently result in damages to Doctors Health and its creditors, including patients, physicians and hospitals. *Cf. 407 East 61st Garage, Inc. v. Savoy Fifth Avenue Corp.,* 244 N.E. 2d 37 (N.Y. 1968).

While joint venturers may, at any time, terminate such a joint venture in the absence of contract term containing a fixed duration, *Valtrol, Inc. v. General Connectors Corp.,* 884 F.2d 149 (4th Cir.1989), the contract in the instant case provided in unmistakable terms that it was not terminable at will by either party, but specifically set forth a stated term of duration, provided specific grounds for

42

termination for cause and set forth detailed procedures by which the contract was to be terminated, which the defendant violated.

## V.
## THE DEBTOR HAS NO RIGHT TO RECOVER FOR THE ALLEGED IMPROPER DRAWS ON THE LETTER OF CREDIT

NYLCare may breached the Contract by drawing on the letter of credit, but the improper draws do not provide the debtor with a cause of action to recover the letter of credit or its proceeds.  First, pursuant to the Maryland HMO Act, the letter of credit is held in trust by the HMO for the benefit of external providers, and is not to be considered property of the estate in the event of the provider's bankruptcy.  Md. Health-General Code, §19-713.2 (d)(3) and (f).  Second, it has been held in this district that neither a standby letter of credit posted by a debtor to assure prompt payment to a landlord, nor its proceeds, is property of the debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(a), and therefore a draw is not recoverable by a trustee as a postpetition transfer.  *Musika v. Arbutus Shopping Ctr. Ltd. P'ship (In re Farm Fresh Supermarkets of Md., Inc.),*  257 B.R. 770, 772 (Bankr.D.Md.2001).

Nevertheless, the draws were improper and are additional evidence of the bad faith of NYLCare in failing to deal fairly with Doctors Health.

## VI.
## THE NYLCARE CLAIM WILL BE DISALLOWED IN ITS ENTIRETY FOR CLAIMS PAID AFTER IT BREACHED THE CONTRACT

In order for NYLCare to have a cause of action based upon the contract with Doctors Health for the satisfaction of claims for which NYLCare is independently liable, NYLCare must not have breached the contract. *In re Northup-Johnson, Inc.,* 15 B.R. 767, 769 (Bankr. D. Md. 1981) ("[I]n order to enforce a contract right, the complaining party must substantially perform under the contract.").

NYLCare has not satisfied its burden of proof that its claim in the amount of $29,796,049.37 is enforceable against the debtor outside of bankruptcy.

As indicated, the Contract between the parties is governed by Maryland law. Under the Maryland statute, Doctors Health was a contract provider. The ultimate liability of NYLCare to pay the claims of external providers is not limited to the amount of the letter of credit required to be posted by the contract provider, pursuant to Section 19-713.2. *Dimensions Health,* 374 Md. 1, 17, 821 A.2d 40, 50 (2003) . NYLCare remains independently liable by statute for the payment of external provider claims in spite of the debtor's "insolvency or other inability or failure [as] a contracting provider, as defined in § 19-713.2 of this subtitle, to pay[.]" Its liability "exists irrespective of the delegation or further subcontracting of health care services by a contracting provider to an external provider, as defined in § 19-713.2," and "may not be altered by

44

contract[.]" *Quoted in IVTx, Inc. v. United Healthcare of Mid-Atlantic, Inc.,* 112 F. Supp.2d 445 (D. Md. 2000).

At the same time, "'[t]he provisions of a contract are enforceable, and a cause of action can be brought upon them, even after the expiration or termination of the agreement.'" *In re Doctors Health, Inc.,* 238 B.R. 594, 606 (Bankr. D.Md. 1999), *aff'd,* 249 B.R. 99 (D. Md. 1999), *quoting Booster Lodge No. 405 v. NLRB,* 459 F.2d 1143, 1152 (D.C. Cir. 1972).

In addition, in order to enforce its rights under the terminated contract, NYLCare must be able to demonstrate that its termination of the contract was permissible by its terms, and not a breach thereof, which NYLCare cannot do.

Section 502(a) of the Bankruptcy Code provides that "A claim or interest, proof of which is filed under Section 501, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under Chapter 7 of this title, objects." *In re Richardson,* 307 B.R. 485, 488 (Bankr. D.Md. 2004). While the filing of a proof of claim is *prima facie* evidence of the validity and amount of the claim, Fed. R. Bankr. P. 3001(f), *Fullmer v. United States (In re Fullmer),* 962 F.2d 1463, 1466 (10th Cir.1992); *In re Gates,* 214 B.R. 467, 472 (Bankr. D. Md. 1997), the claimant always bears the burden of proof that the claim is properly allowable, while an objecting party bears the burden of producing evidence

sufficient to contradict the claim's validity and/or its amount. *Superior Metal Moulding Co., Inc. v. Shipp (In re Friedman),* 436 F. Supp. 234 (D. Md. 1977). As the Fourth Circuit stated in the recent case of *Stancill v. Harford Sands, Inc. (In re Harford Sands, Inc.),* 372 F.3d 637, 640-1 (4th Cir. 2004):

> The Bankruptcy Code establishes a burden-shifting framework for proving the amount and validity of a claim. The creditor's filing of a proof of claim constitutes *prima facie* evidence of the amount and validity of the claim. 11 U.S.C. S 502(a); Fed. R. Bankr.P. 3001(f). The burden then shifts to the debtor to object to the claim. 11 U.S.C. § 502(b); [*Canal Corp. v.*] *Finnman* [*(In re Johnson),* 960 F.2d 396]at 404. The debtor must introduce evidence to rebut the claim's presumptive validity. Fed. R. Bankr.P. 9017; Fed. R. Evid. 301; 4 Collier at ¶ 501.02[3][d]. If the debtor carries its burden, the creditor has the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence. *Id.* at ¶ 502.02[3][f].

*Stancill,* 372 F.3d at 640-1.

"If there is such an objection, § 502 states that the bankruptcy court should allow the claim unless one of the exceptions enumerated in subsection (b) precludes allowance," *Welzel v. Advocate Realty Investments (In re Welzel),* 275 F.3d 1308, 1316 (11th Cir. 2001), that is, whether the debtor has valid, nonbankruptcy defenses to the claim that would render it unenforceable against the debtor or debtor's property outside of bankruptcy. *See, for example, United States v. Sanford, (In re Sanford),* 979 F.2d 1511, 1513 (11th Cir.1992) ("In other words, a claim against the bankruptcy

46

estate will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy.").

While "the existence of a claim is controlled by state law, the allowance or disallowance of a claim in bankruptcy is a matter of federal law left to the bankruptcy court's exercise of its equitable powers." *Finnman,* 960 F.2d at 404 (4th Cir. 1992), *citing In re Northway Agencies, Inc.,* 106 B.R. 29, 32 (N.D.N.Y.1989); *In re Shelter Enterprises, Inc.,* 98 B.R. 224, 229 (Bankr. W.D. Pa.1989); *In re Fantastik, Inc.,* 49 B.R. 510, 513 (D. Nev. 1985). The Court is bound by state law to allow only so much of the NYLCare claim that existed for claims paid at the time NYLCare breached the Contract, because only those claims are recoverable by NYLCare outside of bankruptcy. Because none of the $29,796,049.37 represents payments made by NYLCare prior to the breach, the entire claim will be disallowed.

## VII .
### DOCTORS HEALTH'S FAILURE TO PROVIDE NYLCARE WITH NOTICE OF BREACH AND OPPORTUNITY TO CURE IS OF NO MOMENT

The breach of contract committed in August 1998 by NYLCare in its notice to Doctors Health of its intention to terminate the Contract at the end of calendar year 1998 was an anticipatory breach, which Doctors Health was under no obligation to excuse or defer for any cure period under the Contract. The Court finds that NYLCare would not have cured such breaches (refusing to renew its underlying contract with

47

HCFA, drawing down the letter of credit, refusing to deal in good faith with Doctors Health and wrongfully terminating the Contract without cause) even had NYLCare been afforded additional time because they were the result of willful and purposeful conduct and not inability to perform.

VIII.

DOCTORS HEALTH DID NOT BREACH THE CONTRACT WITH NYLCARE BY ITS FAILURE TO PAY INVOICES FOR JUNE AND JULY 1998

This Court has determined that on August 13, 1998, the date when Lefkowitz declared in her letter to Gold that a breach had occurred, Doctors Health was not in breach of Section 11 of the letter agreement of June 29, 1998, because (1)whether any amount was owed by Doctors Health to NYLCare was in dispute, and (2) in no event did any amount due exceed the $5.2 million amount of the letter of credit.  Part of the dispute over the amount owed was due to NYLCare's failure to demonstrate that it had paid claims as required at the lowest rate and its failure to allow Doctors Health to preview claims before they were paid.  Therefore, despite the requirement that Doctors Health remit payments within five business days, the payment was not due because of the nonperformance by NYLCare of the conditions of the Letter Agreement.  *See* Restatement (Second) Contracts,  § 224.

NYLCare has argued that it is irrelevant whether claims were paid at the lowest rate because it should be presumed to have done so in its own best interest and in the

48

sound exercise of its own business judgment.  Nevertheless, it acknowledged that it paid some claims by mistake and at a higher rate.  The Court finds that the failure of NYLCare to prove that it paid claims at the lowest agreed rate and its failure to allow Doctors Health to verify such payment was prejudicial to Doctors Health, because it had the effect of diminishing the profitability of the Contract.  Without the ability to preview claims and to verify their payment at the proper rate, as the Contract required, Doctors Health was excused from tendering payment to NYLCare of the July payment within the five days after demand.  See Comment a, Restatement (Second) of Contracts § 243.  This failure on the part of NYLCare excused the timely payment by Doctors Health until the amount of the payment could be properly ascertained.

However, even had the failure of Doctors Health to tender timely payment to NYLCare been a partial breach, NYLCare did not treat it as such.  For example, there is no evidence that NYLcare notified the State Insurance Commissioner of the alleged failure of Doctors Health to comply with the plan by tendering the July payment, or that it took any immediate action to assume the duties of Doctors Health in making payments to external providers, as required by Health-General Code Section 19-713.2(g)(2).  Furthermore, there is no evidence that NYLCare ever claimed that Doctors Health was insolvent during from July through September.  Indeed, the debtor continued performing the contract and attempting through negotiation to have NYLCare

49

relent on its decision through the months of August and September, well after the waning days of August 1998, when NYLCare notified Doctors Health that it would not renew its contract with HCFA.

## IX.
## THE LETTER AGREEMENT PERMITTED A CURE OF PRIOR DEFAULTS

The June 29, 1998 letter agreement did not waive any prior breaches, but merely quantified a deficit in payments and permitted Doctors Health to cure any defaults by paying NYLCare $3,176,173, which it did.

## X.
## NYLCARE IS LIABLE FOR DAMAGES TO DOCTORS HEALTH FOR BREACH OF CONTRACT

Because NYLCare has not been able to show that its purported termination of the Contract was actually for cause permissible under the Contract, the Court has determined that it was not permitted to terminate the Contract for its own strategic purposes and thereby shift the entire risk of loss to Doctors Health, at a point before the unprofitable Contract reached its anticipated profitability. In so doing, NYLCare was on notice and accepted the risk that its actions in terminating the Contract might cause it to bear the loss resulting to Doctors Health from its precipitous conduct. As indicated, this misconduct will require this Court to disallow NYLCare's claim in full.

50

The Court also finds that NYLCare is separately liable in damages to Doctors Health.  The failure of NYLCare to maintain its contract with HCFA was a material breach of contract, amounting not only to a failure of  NYLCare to satisfy a condition of the contract, but most significantly, the breach of a duty that would give rise to a claim for damages.  *See In re Columbia Gas,* 50 F.3d 233, for the proposition that when, as here, a contract is clear and unambiguous, the determination of whether a provision was merely a condition that an event occur, or one that gave rise to an affirmative promise (and therefore, a duty) is a matter of law for the Court to determine in its function of contract interpretation, to give effect to the intent of the parties, citing the Restatement (Second) of Contracts § 225(3) (1981), which provides that "a term making an event a condition of an obligor's duty does not of itself impose a duty on the obligee and the non-occurrence of the event is not of itself a breach by the obligee.  Unless the obligee is under such a duty, the non-occurrence of the event gives rise to no claim against him.")  50 F.3d at 241.

The assessment of damages in this case is difficult because the parties acknowledge that the Contract had not yet become profitable when it was breached, and therefore any determination of loss of future profits is speculative at best.  It is also clear that the purported cancellation of the Contract by NYLCare may not have been the sole reason that Doctors Health was forced to liquidate its business in bankruptcy,

51

but it was a substantial cause of the destruction of the debtor's business, which the Court finds was a foreseeable consequence of the breach of contract.

The debtor has shown that the NYLCare contract accounted for 60% of its business and that at the time of breach, the business had a "going concern value" of approximately $35.5 million, according to the debtor's expert, which was the only expert testimony adduced at trial on the complaint. It has also proven to the satisfaction of the Court that the conduct of NYLCare gave rise to substantial claims against the debtor.

Doctors Health is entitled to recover its losses that are the direct, natural and proximate result of the breach. "The rule is that the amount of damages recoverable for breach of contract is such as may reasonably be considered in arising naturally from the breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as a probable result of the breach of it." *Johnson & Towers Baltimore, Inc. v. Vessel Hunter,* 824 F.Supp. 562, 566 (D.Md.1992), *citing Cohen v. American Home Assurance Co.,* 255 Md. 334, 362, 258 A.2d 225 (1969), and *Pennsylvania Threshermen & Farmers Mutual Casualty Ins. Co. v. Messenger,* 181 Md. 295, 29 A.2d 653 (1943).

Accordingly, the Court will enter judgment against NYLCare on the debtor's breach of contract claim in the amount of $21,300,000, representing 60% of the

debtor's going concern value.  All other counts of the complaint for relief inconsistent

with this opinion will be dismissed .[22]

  ORDER ACCORDINGLY.

---

  [22]The doctrine of equitable subordination of claims, codified as Section 510(c) of the Bankruptcy Code, is limited to reordering priorities and does not permit disallowance of claims.  *In re Mobile Steel Co.,* 563 F.2d 692, 699 (5th Cir.1977).  As such, it will not be applied in the instant circumstances.  Likewise, the Court has determined that rescission of the contract is impossible at this juncture for a number of reasons, including the impossibility of returning the parties to their respective positions before the Contract was executed.

cc:  Mark J. Friedman, Esquire
     Susan S. Maher, Esquire
     John D. Corse, Esquire
     John Wellschlager, Esquire
     Piper Rudnick LLP, et al.
     6225 Smith Avenue
     Baltimore, Maryland  21209-3600

     John A. Roberts, Esquire
     Venable, Baetjer and Howard
     1800 Mercantile Bank & Trust Bldg.
     2 Hopkins Plaza
     Baltimore, Maryland  21201
     **Counsel for Doctors Health, Inc.**

     Henry F. Siedzikowski, Esquire
     Mark J. Schwemler, Esquire
     Mark A. Keatney, Esquire
     John P. Elliott, Esquire
     Eric L. Young, Esquire
     Elliott Reihner Siedzikowski & Egan, P.C.
     Union Meeting Corporate Center V
     925 Harvest Drive, Ste. 300, P.O. 3010
     Blue Bell, Pennsylvania  19422

     Melvyn J. Weinstock, Esquire
     Weinstock, Friedman, et al.
     The Executive Center
     4 Reservoir Circle
     Baltimore, Maryland 21208

     Steven F. Benz, Esquire
     Kellogg, Huber et al.
     1615 M Street, N.W., Ste. 400
     Washington, D.C.  20036
     **Counsel for NYLCare Health Plans of the**
     **Mid-Atlantic**

Office of the U.S. Trustee
300 W. Pratt Street, Ste. 350
Baltimore, Maryland  21201